### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | |
|---|---|
| Nancy P.,<br><br>　　　　　　　Plaintiff,<br><br>v.<br><br>Kilolo Kijakazi, Acting Commissioner of<br>Social Security,[1]<br><br>　　　　　　　Defendant. | Civil No. 3:20-cv-01721-SRU<br><br><br><br>March 7, 2022 |

### RECOMMENDED RULING ON PENDING MOTIONS

The Plaintiff, Nancy P.,[2] suffers from diabetes, peripheral neuropathy and other conditions. She applied for disability insurance and supplemental security income benefits through the Social Security Administration, claiming a disability onset date of May 17, 2010. (R. 535.) After lengthy proceedings, including an earlier appeal to this Court, an Administrative Law Judge concluded that the Plaintiff had met her burden to prove disability from May 10, 2016 onward, but not before. (R. 548.)

The Plaintiff now moves the Court for an order reversing or remanding that portion of the decision of the Commissioner of Social Security that denied her benefits for the period May 17, 2010 – May 10, 2016. (ECF No. 19.) The Commissioner has moved for an order affirming that

---

[1]　　　When the Plaintiff filed this action, she named the then-Commissioner of the Social Security Administration, Andrew Saul, as the defendant. (Compl., ECF No. 1.) Commissioner Saul no longer serves in that office. His successor, Acting Commissioner Kilolo Kijakazi, is automatically substituted as the defendant pursuant to Fed. R. Civ. P. 25(d). The Clerk of the Court is respectfully requested to amend the caption of the case accordingly.

[2]　　　Pursuant to Chief Judge Underhill's January 8, 2021 Standing Order, the Plaintiff will be identified solely by first name and last initial, or as "the Plaintiff," throughout this opinion. *See* Standing Order Re: Social Security Cases, No. CTAO-21-01 (D. Conn. Jan. 8, 2021).

decision.  (ECF No. 25.)  The presiding District Judge, the Hon. Stefan R. Underhill, referred both motions to me, Magistrate Judge Thomas O. Farrish, for recommended rulings.  (ECF No. 8.)

The Plaintiff makes two principal arguments for reversal or remand.  First, she contends that the Administrative Law Judge ("ALJ") committed legal error by failing to properly weigh the opinion evidence.  (ECF No. 20, at 2-8.)[3]  Second, she claims that the ALJ erred by failing to properly analyze her subjective statements about the intensity, persistence, and limiting effects of her symptoms.  (*Id.* at 8-11.)

Having carefully considered the parties' submissions, and having carefully reviewed the entire, 1,979-page administrative record, I conclude that the ALJ committed no reversible legal error and that his decisions were supported by substantial evidence.  Accordingly, I recommend that the District Judge (1) deny the Plaintiff's Motion for Order Reversing the Decision of the Commissioner or in the Alternative Motion for Remand for a Hearing (ECF No. 19); (2) grant the Commissioner's Motion for an Order Affirming the Decision (ECF No. 25); and (3) enter judgment in the Commissioner's favor.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

On June 14, 2010, the Plaintiff filed applications for disability insurance ("DI") and supplemental security income ("SSI") benefits under Titles II and XVI, respectively, of the Social Security Act.  (R. 153-63.)  She claimed that she could not work due to diabetes, kidney problems, stomach trouble and back pain (R. 52, 59), and she initially alleged a disability onset date of January 1, 2009.  (R. 18, 153-63.)  The Social Security Administration ("SSA") denied her claims (R. 86-93), and then denied them again after reconsideration.  (R. 97-111.)

---

[3]      Page citations to the Plaintiff's brief are to the ECF page rather than to the page number at the bottom of the document.

At the Plaintiff's request, ALJ Dierdre R. Horton held a hearing on January 6, 2012. (R. 29-49.) At the hearing, the Plaintiff amended her disability onset date to May 17, 2010. (R. 32-33.) On February 10, 2012, ALJ Horton issued an unfavorable decision, finding that the Plaintiff could perform the full range of light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b). (R. 15-28.) The Plaintiff requested review of the ALJ's decision by the Appeals Council on March 26, 2012 (R. 13), but the Council denied the request on July 2, 2013. (R. 5-11.)

The Plaintiff then filed a civil action in this Court, and moved for judgment on the pleadings. (ECF No. 12, *[Plaintiff] v. Colvin*, No. 3:13-cv-1295.) She argued that ALJ Horton "failed to follow the treating physician rule," "failed to properly evaluate [her] credibility," and "failed to adequately consider [her] obesity." (ECF No. 13, *[Plaintiff] v. Colvin*, No. 3:13-cv-1295.) On February 23, 2015, Magistrate Judge Holly B. Fitzsimmons addressed the first argument in a recommended ruling. (R. 685-715.) ALJ Horton had declined to give controlling weight to the opinions of the Plaintiff's internist, Dr. Steven Urciuoli (R. 712), and Judge Fitzsimmons did not hold that this constituted a reversible error. But she did hold that, when an ALJ fails to give controlling weight to a treating physician's opinions, she becomes "obliged . . . to explain the weight" given to the other medical opinion evidence, including opinions from state agency consultants. (R. 712-13.) Because ALJ Horton "undertook no such consideration," her written decision "frustrate[d] meaningful review." (R. 714.) Without reaching the Plaintiff's other arguments, Judge Fitzsimmons recommended that the case be remanded. (R. 715.) District Judge Janet C. Hall adopted the recommendation over the Commissioner's objection on March 23, 2015 (R. 678-84), and several months later, the Appeals Council remanded the claim for a new hearing and decision. (R. 673-76.)

3

ALJ Horton then held a second hearing on November 30, 2016. (R. 610-72.) On June 13, 2017, she found the Plaintiff to be disabled beginning April 22, 2017, but not before. (R. 791-805.) The Plaintiff filed exceptions with the Appeals Council to the portion of the ALJ's decision that found she was not disabled for the period from May 17, 2010 to April 21, 2017. (R. 1045-47; 1054-58.) On June 11, 2018, the Appeals Council remanded the claim for yet another hearing and decision. (R. 806-14.)

ALJ Matthew Kuperstein held a third hearing on June 13, 2019. (R. 569-609.) The Plaintiff's counsel, Patrick Busse, appeared on her behalf. (R. 570.) The ALJ heard additional testimony from the Plaintiff, and also heard extensive testimony from a medical expert ("ME"), Dr. Stephen R. Kaplan. (R. 579-99.) On October 10, 2019, ALJ Kuperstein found that the Plaintiff was disabled beginning May 10, 2016, but not before. (R. 530-60.)

As discussed below, ALJs are required to follow a five-step sequential evaluation process in adjudicating Social Security claims, and ALJ Kuperstein's written decision followed that format. At Step One of his analysis, he found that the Plaintiff met the insured status requirements of the Social Security Act through December 31, 2015. (R. 538.) He also found that the Plaintiff had not engaged in substantial gainful activity since the amended claimed disability onset date of May 17, 2010. (R. 539.) At Step Two, he found that the Plaintiff suffers from the severe impairments of diabetes mellitus, obesity and chronic kidney disease. (*Id.*) Beginning on May 10, 2016, the Plaintiff also has had a severe impairment of peripheral neuropathy. (*Id.*)

At Step Three, the ALJ concluded that the Plaintiff's impairments met the criteria of a "Listing" on May 10, 2016, but not before. (R. 547.) Specifically, he found that "[b]eginning on May 10, 2016, the severity of the claimant's impairments have met the" Listing for chronic kidney disease with neuropathy – that is, "section 6.05(A)(3) and (B)(2) of 20 CFR Part 404, Subpart P,

Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416 925 and 416.926)."  (R. 547.)  He also found, however, that "[f]rom May 17, 2010 to May 10, 2016 . . . the claimant did not have an impairment or combination of impairments that meets or medically equals the severity of" that or any other Listing.  (R. 541.)

The ALJ then concluded that, during that six-year period, the Plaintiff retained the residual functional capacity ("RFC") to perform sedentary work with limitations.  (R. 541.)  "After careful consideration of the entire record," he found that "from May 17, 2010 to May 10, 2016 . . . the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that she was further limited to occasional balancing, stooping, crouching, and crawling."  (*Id.*)  He then found that the Plaintiff's limitations rendered her unable to do any of her past relevant work (R. 545), but at Step Five in the five-step process, he relied on the testimony of a vocational expert ("VE") to find that there were jobs in the national economy that the Plaintiff could have performed during the period in question.  (R. 546.)  Accordingly, the ALJ determined that "the claimant was not disabled from May 17, 2010 to May 10, 2016."  (R. 548.)

As a result of these two determinations, the ALJ awarded the Plaintiff SSI benefits "beginning on May 10, 2016."  (R. 548.)  He did not award her DI benefits, even in part, because her "date last insured was December 31, 2015," before the onset of disability.  (*Id.*)  The Plaintiff sought review by the Appeals Council, but the Council denied review on September 16, 2020.  (R. 525-27.)

The Plaintiff then filed this action on November 17, 2020.  (Compl., ECF No. 1.)  The Commissioner answered the complaint by filing the administrative record on April 15, 2021.  (ECF No. 13 *see also* D. Conn. Standing Scheduling Order for Social Security Cases, ECF No. 4, at 2

(stating that the Commissioner's filing of the administrative record is "deemed an Answer (general denial) to Plaintiff's Complaint").)  On August 12, 2021, the Plaintiff filed a motion for an order reversing or remanding the Commissioner's decision.  (ECF No. 19.)  On November 5, 2021, the Commissioner filed a motion for an order affirming that decision.  (ECF No. 25.)  The Plaintiff filed a reply brief on November 17, 2021.  (ECF No. 26.)  The parties' motions are therefore ripe for decision.

## II.    APPLICABLE LEGAL PRINCIPLES

To be considered disabled under the Social Security Act, "a claimant must establish an 'inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.'"  *Smith v. Berryhill*, 740 F. App'x 721, 722 (2d Cir. 2018) (summary order) (quoting 20 C.F.R. § 404.1505(a)).   To determine whether a claimant is disabled, the ALJ follows a familiar five-step evaluation process.

At Step One, the ALJ determines "whether the claimant is currently engaged in substantial gainful activity."  *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008)).  At Step Two, the ALJ analyzes "whether the claimant has a severe impairment or combination of impairments."  *Id.*  At Step Three, the ALJ then evaluates whether the claimant's disability "meets or equals the severity" of one of the "Listings" – that is, the specified impairments listed in Appendix 1 to Subpart P of 20 C.F.R. Part 404.  *Id.*  At Step Four, the ALJ uses an RFC assessment to determine whether the claimant can perform any of her "past relevant work."  *Id.*  And at Step Five, the ALJ considers "whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's [RFC], age, education, and work experience."  *Id.*  The claimant bears the burden of proving her case at

Steps One through Four.  *Id.*  At Step Five, "the burden shift[s] to the Commissioner to show there is other work that [the claimant] can perform."  *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 445 (2d Cir. 2012) (per curiam).

In reviewing a final decision of the Commissioner, this court "perform[s] an appellate function."  *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981).  Its role is to determine whether the Commissioner's decision is supported by substantial evidence and free from legal error.  "A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error."  *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (internal quotation marks omitted).

A disability determination is supported by substantial evidence if a "reasonable mind" could look at the record and make the same determination as the Commissioner.  *See Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  Although the standard is deferential, "[s]ubstantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009) (internal quotation marks and citations omitted).  When the decision is supported by substantial evidence, the Court defers to the Commissioner's judgment.  In other words, "[w]here the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, [this Court] will not substitute [its] judgment for that of the Commissioner."  *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002).

An ALJ does not receive the same deference if he has made a material legal error.  Put differently, district courts do not defer to the Commissioner's decision "[w]here an error of law has been made that might have affected the disposition of the case."  *Pollard v. Halter*, 377 F.3d

183, 189 (2d Cir. 2004) (internal quotation marks omitted).  "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision."  *Ellington v. Astrue*, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

In this case, the Plaintiff argues that the ALJ's decision was affected by legal error or unsupported by substantial evidence in two principal respects.  (*See generally* ECF No. 20.)  I will examine each argument in turn.

## III.    DISCUSSION

### A.    The Plaintiff's Challenges to the ALJ's Treatment of the Opinion Evidence

The Plaintiff begins by arguing that "the ALJ failed to properly weigh the medical opinion evidence."  (ECF No. 20, at 2-8.)  She makes three principle arguments under this heading.  First, she claims that the ALJ breached the treating physician rule when assessing the weight to be accorded to the opinions of her treating internist, Dr. Urciuoli.  (*Id.* at 3-4.)  Next, she contends that the ALJ erred in assigning weight to the opinion of consultative examiner, Dr. Herbert Reiher.  (*Id.* at 4-6.)  Finally, she argues that the ALJ erred in relying on the opinions from a non-examining medical expert. Dr. Stephen R. Kaplan.  (*Id.* at 6-8.)  I will address the first argument in Section III.A.1 below, and because the second and third arguments share a common theme, I will address those arguments together in Section III.A.2.

#### 1.    Dr. Urciuoli

The Plaintiff's first argument implicates the "treating physician rule" applicable to Social Security claims filed before March 27, 2017.  20 C.F.R. §§ 404.1527, 416.927.  Under that rule, the ALJ must give the treating physician's opinion "controlling weight" when the opinion is supported by and consistent with the record.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  As

stated in the Social Security regulations, "[i]f we find that a treating source's medical opinion on the issue(s) of the nature and severity of [the plaintiff's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the plaintiff's] case record, we will give it controlling weight." *Id.*

If the ALJ decides that a treating source's opinion is not entitled to controlling weight, he must then determine how much weight to give it. When doing so, the ALJ ordinarily must explicitly consider several factors, known as the "*Burgess* factors," which are: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and, (4) whether the physician is a specialist." *Selian v. Astrue,* 708 F.3d 409, 418 (2d Cir. 2013) (per curiam) (citing *Burgess,* 537 F.3d at 129-30). "At both steps, the ALJ must 'give good reasons in its notice of determination or decision for the weight it gives the treating source's medical opinion.'" *Estrella v. Berryhill*, 925 F.3d 90, 96 (2d Cir. 2019) (quoting *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (per curiam)) (brackets omitted). An ALJ can commit "procedural error" when he fails to "'explicitly' apply the *Burgess* factors when assigning weight" to a treating physician's opinion. *Id.* (quoting *Selian*, 708 F.3d at 419-20).

Such a failure can be excused, however, when a "searching review of the record assures [the court] that the substance of the treating physician rule was not traversed." *Id.* The Second Circuit has explained that the rule is not "traversed" when the "record otherwise provides 'good reasons'" for the weight assignment. *Id.* Following this principle, district courts have affirmed ALJ decisions that failed to explicitly discuss each of the *Burgess* factors, when the record otherwise provided good and sufficient reasons for the weight assessment. In *Robert K. v. Kijakazi*, for example, the ALJ "did not explicitly walk through each of the factors set forth in

*Burgess.*"  No. 3:20-cv-466 (SALM), 2021 WL 3088058, at *7 (D. Conn. July 22, 2021.)  Judge Merriam nevertheless affirmed the ALJ's treatment of the opinion evidence, because "[u]pon review of the entire record, the Court [found] that the [opinion] is internally inconsistent, and unsupported by both [the physician's] own treatment notes and the record as a whole." *Id.* "Therefore, plaintiff's contention that the ALJ erred by according [the physician's] opinion little weight is without merit because the record 'provides good reasons for the weight that the ALJ assigned.'" *Id.* (quoting *Martinez v. Saul*, No. 3:19-cv-1017 (TOF), 2020 WL 6440950, at *11 (D. Conn. Nov. 3, 2020)).

In this case, the administrative record contains nine principal inputs from Dr. Urciuoli.  In roughly chronological order, they are: (1) medical records and reports beginning November 19, 2007 and continuing through June 25, 2010 (R. 336-74); (2) a handwritten note dated June 25, 2010, in which Dr. Urciuoli wrote that the Plaintiff was "disabled from doing any type of work for at least one year" (R. 327); (3) a September 14, 2010 RFC assessment (R. 344-52); (4) a November 25, 2010 response to a questionnaire from Plaintiff's counsel (R. 422-29); (5) a November 22, 2011 letter, in which Dr. Urciuoli opined (among other things) that the Plaintiff's "ability to sustain attention and concentration would be frequently interrupted by her symptoms of pain and fatigue," and that her "debilitating impairments have rendered her incapable of returning to her past work or any other type of full time competitive work" (R. 436-37); (6) a February 27, 2014 RFC assessment, stating that the Plaintiff was limited to only occasional standing and walking (R. 1511); (7) a February 1, 2016 response to yet another disability questionnaire from Plaintiff's counsel (R. 1346-50); (8) a letter, also dated February 1, 2016, in which Dr. Urciuoli opined that the Plaintiff was "unable to do full-time, competitive work," and that her "condition and disability will likely last more than twelve months and are unlikely to improve at all in the future" (R. 1343);

10

and (9) a May, 10, 2016 letter from Dr. Urciuoli to Plaintiff's counsel, in which the doctor stated that the Plaintiff "does indeed meet the disability criteria for . . . [c]hronic kidney disease," because she had an estimated glomerular filtration rate[4] of less than 20ml/min/1.73m$^2$ and "[p]eripheral neuropathy based on absent vibration sense and absent [A]chilles tendon reflexes in both feet." (R. 1397.)

The ALJ assigned varying weights to these items.  For example, he gave great weight to the May 10, 2016 letter (R. 543), and relied upon it in reaching his conclusion that the Plaintiff was disabled on that date.  (R. 548.)  But he gave little weight to the November 22, 2011 letter, because the treatment notes did "not support," and were not "consistent with," "any complaints of ongoing attention or concentration deficits."  (R. 543.)  He likewise gave little weight to the February 27, 2017 RFC assessment, because "the form is a checklist and does not provide any explanation nor is [it] supported by the claimant's treatment notes demonstrating any upper extremity weakness or strength deficits."  (R. 543-44.)  And he gave no weight to other items because they were either "incomplete, unsigned and undated" or purported to opine on the ultimate issue of disability, "an issue reserved to the Commissioner."  (R. 544.)

In a cursory, two-page argument, the Plaintiff challenges these weight assignments.  (ECF No. 20, at 3-4.)  She disagrees that the treatment notes provided insufficient support for Dr. Urciuoli's opinions, because the doctor "identified numerous appropriate medical findings supporting his opinions."  (Id. at 4.)  She also notes that the ALJ faulted one opinion for being in

---

[4]    "Glomeruli are tiny filters in your kidneys that help remove toxins (waste) from your blood."    Cleveland Clinic, *Estimated Glomerular Filtration Rate (eGFR), available at* https://my.clevelandclinic.org/health/diagnostics/21593-estimated-glomerular-filtration-rate-egfr (last visited Mar. 7, 2022).  "Estimated glomerular filtration rate (eGFR) measures how much blood these filters clean every minute based on your body size."  *Id.*

"checklist" form, and she argues that it is improper to discount a treating physician's opinion merely because it was given in that form.  (ECF No. 20, at 3.)

The ALJ discussed at least three out of the four *Burgess* factors when assigning weight to Dr. Urciuoli's opinions.  He referenced the "amount of medical evidence supporting the opinion" when, for example, he commented on the paucity of medical records supporting the 2009 disability date that the doctor had claimed in his November 22, 2011 letter (R. 543, 436-47), and when he pointed out that there were no medical records supporting the Plaintiff's claimed upper extremity weakness and strength deficits.  (R. 543-44.)  He likewise discussed the "consistency of the opinion with the remaining medical evidence" when, among other instances, he pointed out that "the severity of the claimant's chronic low back pain, fatigue and weakness are not demonstrated in the records."  (R. 544.)  And he considered Dr. Urciuoli's specialization when he observed that the doctor is not a mental health specialist.  (*Id.*)  With respect to the "frequency, length, nature, and extent of the treatment," the ALJ obviously understood that Dr. Urciuoli had treated the Plaintiff for a long time, and he made several references to the "longitudinal" nature of that treatment.  (*E.g.,* R. 542.)  But he did not expressly explain how the "frequency, length, nature, and extent of the treatment" affected his decision to accord less than controlling weight to some of the doctor's opinions.

Assuming, *arguendo*, that this constituted a failure to address the *Burgess* factors, the question presented is whether that failure may be excused on the ground that the record otherwise contains  good reasons for the weight assignments.  *See, e.g., Robert K.*, 2021 WL 3088058, at *7. Having carefully reviewed the record, I conclude that there were good reasons for each assignment. In the case of the May 10, 2016 letter, the ALJ gave it "great weight" as a statement of the Plaintiff's condition on that date, but not before.  (R. 543, 1397.)  The letter reported that the

Plaintiff had an "eGFR of Less than 20ml/min/1.73m2; based on serial blood tests at least 90 days apart over the past 12 months," and "[p]eripheral neuropathy based on absent vibration sense and absent achilles tendon reflexes in both feet." (R. 1397.)  The ALJ relied on this report in reaching his conclusion that the Plaintiff met Listing 6.05 on May 10, 2016, which in the context of her case required both an "estimated glomerular filtration rate (eGFR) of 20 ml/min/1.73$^2$ or less" *and* "[p]eripheral neuropathy."  20 C.F.R.  Part 404, Subpart B, App'x 1.  But the letter said nothing about the Plaintiff's satisfaction of both elements of the Listing *before* May 10, 2016 – and, in particular, said nothing about peripheral neuropathy before that date.  (R. 1397; *see also* earlier medical records failing to document symptoms of peripheral neuropathy, *e.g.*, R. 1450 (May 15, 2012 treatment record showing "[n]o peripheral neuropathy").)  The ALJ did not err in declining to read into the letter an opinion that it simply did not contain.

The ALJ likewise had good reasons for declining to give any weight to the June 25, 2010 handwritten note.  In that cursory, three-sentence note, Dr. Urciuoli stated only that the Plaintiff was then under his care; that she "suffers from severe uncontrolled Type I diabetes complicated by ketoacidosis," and that "she is disabled from doing any type of work for at least one year." (R. 327.)  The ALJ properly disregarded it (R. 543), because it is well settled that the determination of the ultimate issue of disability is reserved to the Commissioner.  *See Snell v. Apfel*, 177 F.3d 128, 133–34 (2d Cir. 1999) (holding that disability determinations are "expressly reserved to the Commissioner"); 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1) ("A statement by a medical source that you are "disabled" or "unable to work" does not mean that we will determine that you are disabled.").

The ALJ also correctly noted that several opinions were not supported by Dr. Urciuoli's own treatment notes.  For example, in the February 1, 2016 letter, the doctor opined that the

Plaintiff's "activities are severely limited by shortness of breath, extreme fatigue, and chronic back pain." (R. 1343.)  The ALJ did not accord controlling weight to this opinion, because "the severity of the claimant's chronic low back pain, fatigue, and weakness are not demonstrated in the records." (R. 544.)  He observed that Dr. Urciuoli's treatment notes during the six-year period "consistently and predominately demonstrated entirely normal findings."[5]  (R. 542.)  These statements are sufficiently supported by the record, because Dr. Urciuoli's treatment notes do indeed document normal respiration (*e.g.,* R. 1361, 1373, 1381, 1401, 1407, 1452, 1459, 1463, 1466, 1469-70, 1474, 1478), normal range of motion (*e.g.*, R. 415, 1336, 1355, 1361, 1373, 1381), normal gait (*e.g.*, R. 409, 411, 415, 417, 1336, 1355), and an absence of musculoskeletal symptoms (*e.g.*, R. 1334, 1336, 1355, 1401, 1407) on several different occasions spread over time.  The ALJ's decision not to accord controlling weight to the November 22, 2011 letter, the February 27, 2014 RFC assessment, the September 14, 2010 RFC assessment and the November 25 impairment questionnaire, on the ground that "the treatment notes do not support" them, is supported by the same medical records.

The Plaintiff cites to entries in the medical records that support Dr. Urciuoli's opinions (ECF No. 20, at 4), but provided that the ALJ had good reasons for his weight assignments, his conclusions are entitled to deference from this Court.  "It is not the function of this Court to re-weigh evidence or consider *de novo* whether [a claimant] is disabled."  *Teena H. o/b/o N.I.K. v.*

---

[5]      In her reply brief, the Plaintiff argues that "[a] layman like an ALJ is simply not competent to say that what he or she perceives as a 'normal' finding," and that ALJs who do so are impermissibly "playing doctor." (ECF No. 26, at 2-3.)  Here, however, the ALJ did not reach these conclusions by himself.  The records themselves use the word "normal" on a number of occasions, and as will be shown in Section III.A.ii, Dr. Reiher reported a number of "normal" findings upon examining the Plaintiff. (R. 1555-58.)  Moreover, Dr. Kaplan testified that the Plaintiff's physical examinations were generally "normal."  (R. 617) ("She tends to have a normal physical examination.").

*Comm'r of Soc. Sec.*, 521 F. Supp. 3d 287, 291 (W.D.N.Y. 2021). Rather, "[a]bsent a legal error, the Court must uphold the Commissioner's decision if it is supported by substantial evidence, even if the Court might have ruled differently had it considered the matter in the first instance." *Russell v. Saul*, 448 F. Supp. 3d 170, 175 (D. Conn. 2020). Stated another way, "[e]ven where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings 'must be given conclusive effect' so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (quoting *Schauer v. Schweiker,* 675 F.2d 55, 57 (2d Cir. 1982)).

Finally, the Plaintiff takes exception to the ALJ's treatment of the February 27, 2014 RFC assessment because "he found the opinions were only provided in a 'checklist' form" (ECF No. 20, at 3), but this argument is legally and factually unpersuasive. While it is true that "the evidentiary weight of a treating physician's medical opinion can[not] be discounted by an ALJ based on the naked fact that it was provided in a check-box form," *Colgan v. Kijakazi*, 22 F.4th 353, 361 (2d Cir. 2022), ALJs *can* discount "stand-alone 'checkbox forms' that 'offer little or nothing with regard to clinical findings and diagnostic result' and '[are] inconsistent with findings reflected in the doctors' notes." *Id.* (quoting *Heaman v. Berryhill*, 765 F. App'x 498, 501 (2d Cir. 2019)) (brackets and ellipsis omitted). Here, the ALJ did not discount the February 27, 2014 RFC assessment solely because it was made in a check-box form. Rather, he did so because it also failed to "provide any explanation nor [was it] supported by the claimant's treatment notes demonstrating any upper extremity weakness or strength deficits." (R. 543-44.) Moreover, it

purported to opine on mental health limitations, and "Dr. Urciuoli is not a mental health specialist." (*Id.*)  In summary, the ALJ did not err in his treatment of Dr. Urciuoli's opinions. [6]

### 2.    *Drs. Reiher and Kaplan*

Dr. Reiher is an internist who examined the Plaintiff on August 14, 2014.  (R. 1555-58.) After the exam he prepared a report, in which he recorded her as saying that she had "dull low back pain since 2009, which is daily and fairly constant," and which "radiates to both legs to the ankle area with no numbness."  (R. 1555.)  He also recorded her as saying that she "had dull bilateral neck pain since 2009 radiating daily to both shoulders and arms with no numbness."  (*Id.*) His examination revealed that the Plaintiff was "in no acute distress" and had a "normal" gait and a "normal" stance.  (R. 1556.)  While she could not walk on heels or toes, and while she could not squat, she "[u]sed no assistive devices" and was "[a]ble to rise from [her] chair without difficulty." (*Id.*)  Her lumbar flexion was limited, but she had full range of motion in her cervical spine, shoulders, elbows, hips, knees and ankles.  (R. 1557.)  In conclusion, Dr. Reiher opined that "[t]he claimant has moderate postural limitations due to back, leg, neck, and arm pain producing moderate limitations with climbing, stooping, bending, crawling, kneeling, crouching, and reaching," but had "no fine motor limitations" nor any "vision, hearing or speech limitations."  (R. 1558.)

The ALJ gave Dr. Reiher's report "some weight."  (R. 544.)  Specifically, he relied on the report in concluding that the Plaintiff could not work at the light, medium, heavy, or very heavy

---

[6]       I do agree with the Plaintiff on one point related to Dr. Urciuoli.  In her motion to affirm, the Commissioner claimed to observe additional support for the ALJ's treatment of Dr. Urciuoli's opinions in the "Plaintiff's noncompliance" with treatment and "the conservative course of treatment."  (ECF No. 25-1, at 5.)  In her reply brief, the Plaintiff points out that "the ALJ did not discount the opinions from Dr. Urciuoli on this basis."  (ECF No. 26, at 4.)  Under the circumstances of this case, I agree that the Commissioner's argument is an impermissible "*post hoc* rationalization[] for agency action."  (*Id.*) (quoting *Snell*, 177 F.3d at 134).

exertional levels during the six-year period predating May 10, 2016.  (*See* R. 544-45) ("The undersigned gives the assessment some weight, accepting that the claimant is limited to sedentary exertional capacity until May 10, 2016, due to her multiple physical impairments, including diabetes and obesity.")  The ALJ also evidently used Dr. Reiher's report in the course of concluding that that the requirements of Listing 6.05 had not been met in 2014; he observed "that there is no discussion of peripheral neuropathy or related symptomatology in this August 2014 consultation."  (R. 545.)

The administrative record included evidence from Dr. Kaplan as well as Dr. Reiher.  Dr. Kaplan is a graduate of the New York University School of Medicine and a former Associate Dean of the Brown University Medical School who is board-certified in internal medicine and rheumatology.  (R. 1414-28, 581.)  He reviewed the Plaintiff's medical file and testified at both the November 30, 2016 hearing before ALJ Horton (R. 615-45) and the June 13, 2019 hearing before ALJ Kuperstein.  (R. 579-600.)  In the 2016 hearing, he characterized the Plaintiff as someone who suffered from "chronic kidney disease" but still "tend[ed] to have a normal physical examination."  (R. 617.)  He noted that her kidney disease had not yet produced anemia, and he observed that "there would be no reason for her to . . . feel particularly tired and fatigued, except for [her] weight."  (R. 621.)  He stated that she did not then satisfy the criteria for Listing 6.05, because although she had the required eGFR reading, the record did not document peripheral neuropathy of sufficient severity.  (R. 646); *see also* Listing 6.00C4 (stating that, to satisfy Listing 6.05B2, "the peripheral neuropathy must be a severe impairment").  When asked whether he observed any limitations "as far as sitting, standing, walking, lifting, carrying, [and] doing basic work activities," he "recommended" that the Plaintiff "be limited to a sedentary work situation" due to her weight and "the loss of . . . deep tendon reflexes."  (R. 621-22.)  And when asked about

Dr. Urciuoli's contention that the Plaintiff could "sit only one hour, stand and walk only one hour, and needs to change positions every 30 minutes," he answered "no," explaining that the medical record of her physical impairments provided no support for that claim.  (R. 644-45.)

Between the 2016 hearing and ALJ Horton's June, 2017 decision, Dr. Kaplan responded to medical interrogatories.  (R. 1638-40.)  He stated that the Plaintiff's impairments still did not meet or equal any impairment described in the Listings.  (R. 1639.)  When asked to "identify any functional limitations or restrictions," including "such things as the ability to sit, stand, walk, lift, carry, push and pull," he replied that his opinion remained unchanged since his hearing testimony.  (R. 1640.)  He noted that "in [her] last 3 visits to Dr. Urciuoli," the Plaintiff was "reported as being asymptomatic and, except for morbid obesity," had an "unremarkable physical exam."  (*Id.*)

At the 2019 hearing, Dr. Kaplan reconsidered his earlier opinions about Listing 6.05.  Noting that Dr. Urciuoli's May 10, 2016 letter had documented "peripheral neuropathy based on absent vibration sense and absent achilles tendon reflexes in both feet," Dr. Kaplan stated that "the claimant actually meets a listing because of that on May 10, 2016."  (R. 586.)  But he testified that the record did not document satisfaction of a Listing before that date.  (R. 585-86.)  He also testified that the record did not "support a conclusion that the claimant was unable to lift . . . zero to ten pounds occasionally, and to carry zero to five pounds occasionally," during the six-year period before May 10, 2016.  (R. 589-90.)

The ALJ gave "significant weight" to Dr. Kaplan's opinions.  (R. 545.)  He wrote that Dr. Kaplan "testified that the claimant's eGFR . . . was noted to be below 20 from May 17, 2010 to May 10, 2016; however, the record fails to reflect that the peripheral neuropathy, by itself or with other impairments combined, resulted in any more than a minimal or significant ongoing functional limitation prior to that date."  (R. 548.)  He observed that "Dr. Kaplan's opinion . . . is

18

well supported by and consistent with the overall record," and reflected consideration of "the claimant's longitudinal treatment history." (R. 545.)

On appeal to this Court, the Plaintiff challenges the ALJ's reliance on Drs. Reiher and Kaplan on the ground that they are mere consultants whose opinions should not trump those of her treating physician. (ECF No. 20, at 4-6.) Correctly noting that the Second Circuit has "cautioned that ALJs should not rely heavily on the findings of consultative physicians" like Dr. Reiher "after a single examination" (*id.* at 5) (quoting *Selian v. Astrue*, 708 F.3d 409, 419 (2d Cir. 2013)), and contending that the opinions of non-examining consultants like Dr. Kaplan "are ordinarily entitled to the least amount of weight" (*id.* at 6) (citing 20 C.F.R. §§ 404-1527(c)(1)-(2), 416.927(c)(1)-(2)), she argues that Dr. Urciuoli "was in a better position to assess [her] functional capacity in a work environment." (*Id.* at 6.)

Yet the law is clear that an ALJ may rely on the opinions of examining and non-examining consultants, provided that those opinions are consistent with the record. "It is well-settled that a consulting physician's opinion can constitute substantial evidence supporting an ALJ's conclusions." *Suarez v. Colvin*, 102 F. Supp. 3d 552, 577 (S.D.N.Y. 2015) (collecting cases); *see also Rosier v. Colvin,* 586 F. App'x. 756, 758 (2d Cir. 2014) (summary order) (substantial evidence supporting ALJ's conclusion that a treating physician's opinion should not be given controlling weight included evaluations by a consultative examiner). To be sure, "[c]ourts in this Circuit long have casted doubt on assigning significant weight to the opinions of consultative examiners when those opinions are based solely on a review of the record." *Soto v. Comm'r of Soc. Sec.*, No. 19-cv-4631 (PKC), 2020 WL 5820566, at *7 (E.D.N.Y. Sept. 30, 2020). But as long as the opinions have proper support in the record, "[a]n ALJ is entitled to rely on the opinions of both examining and non-examining State agency medical consultants, because those consultants are deemed to be

qualified experts in the field of social security disability." *Wilson v. Saul*, No. 3:18-cv-01097 (WWE), 2019 WL 2603221, at *11 (D. Conn. June 25, 2019); *see also Suarez*, 102 F. Supp. 3d at 577 ("[A]n ALJ may give greater weight to a consultative examiner's opinion than a treating physician's opinion if the consultative examiner's conclusions are more consistent with the underlying medical evidence."); *Colbert v. Comm'r of Soc. Sec.*, 313 F. Supp. 3d 562, 577 (S.D.N.Y. 2018) ("[A] consultative examiner's opinion may be accorded greater weight than a treating source's opinion where the ALJ finds it more consistent with the medical evidence.") (citing *Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995)) ("[T]he opinions of non-examining sources [can] override treating source's opinions provided they are supported by evidence in the record."), *accord Suttles v. Colvin*, 654 F. App'x 44, 46 (2d Cir. 2016) (summary order) (holding that the ALJ did not err in giving great weight to a consultative examiner's opinion because it was consistent with the record evidence).

In this case, the ALJ had sufficient reasons for concluding that Dr. Reiher's and Dr. Kaplan's opinions were more consistent with the record than Dr. Urciuoli's. As noted above, Dr. Urciuoli's own treatment notes document normal respiration (*e.g.,* R. 1361, 1373, 1381, 1401, 1407, 1452, 1459, 1463, 1466, 1469-70, 1474, 1479), normal range of motion (*e.g.*, R. 415, 1336, 1355, 1361, 1373, 1381), normal gait (*e.g.*, R. 409, 411, 415, 417, 1336, 1355), and an absence of musculoskeletal symptoms (*e.g.*, R. 1334, 1336, 1355, 1401, 1407) on several different occasions during the six-year period at issue. Dr. Reiher personally observed a normal gait; a full range of motion in the cervical spine, shoulders, elbows, forearms, wrists, hips, knees and ankles; and "no fine motor limitations." (R. 1555-58.) As Dr. Kaplan explained, Dr. Urciuoli's opinion that the Plaintiff could sit, stand and walk for only an hour connoted "a pretty extreme level of impairment"

(R. 644), and the ALJ was within his rights to conclude that the consultants' contrary opinions were better supported by the record.

The cases cited by the Plaintiff are not to the contrary. She cites *Rosa v. Callahan*, 168 F.3d 72, 81 (2d Cir. 1999) for the proposition that an ALJ may not infer an ability to do sedentary work from a consultant's opinion that is silent on the issue (ECF No. 20, at 4), but here, Dr. Kaplan opined that she could do sedentary work even if Dr. Reiher did not. (R. 622, 638.) She then cites *Pines v. Commissioner of Social Security*, No. 13-cv-6850-AJN-FM, 2015 WL 872105, at *9-10 (S.D.N.Y. Mar. 2, 2015) for the proposition that ALJs err when they "rely on a report from a consultative examiner who failed to address limitations described by a treating source" (ECF No. 20, at 4-5), but in *Pines* the ALJ "never set forth any reasons – much less good reasons – for failing to accord controlling weight" to the treating physician's opinions on the claimant's limitations. 2015 WL 872105, at *9. In this case, by contrast, the ALJ set forth good reasons declining to give controlling weight to Dr. Urciuoli's opinions. (*See* discussion, Section III.A.i *supra*.) And *Smith v. Commissioner of Social Security, Karki v. Colvin* and *Jakubowski v. Berryhill* are likewise distinguishable. *See Smith*, No. 18-cv-6626 (MKB), 2020 WL 7262847, at *17 (E.D.N.Y. Dec. 10, 2020) (holding that it was error for the ALJ to rely on "consultative examiners who did not see Plaintiff over a period of time," but in the context of a *mental* impairments "which by their nature are best diagnosed over time"); *Karki*, No. 13-cv-06395 (SLT), 2017 WL 728225, at *17 (E.D.N.Y. Feb. 23, 2017) (holding that it was error to accord "significant weight" to a one-time evaluation by a state agency examiner who "lack[ed] the specialization" of the claimant's treating physician, in contrast to this case, where the ALJ assigned only "some weight" to the consultative examiner, who – like the treating physician – was an internist) (*see* R. 544, 1555); *Jakubowski*, No. 15-cv-6530 (MKB), 2017 WL 1082410, at *18 (E.D.N.Y. Mar. 22, 2017) (holding that the

ALJ erred in failing to "provide good reasons for crediting the opinions of" state agency consultants over the claimant's treating physician, in contrast to this case, in which the ALJ provided those reasons, *see* discussion, Section III.A.i *supra*).  Indeed, the court in *Jakubowski* expressly noted that "the opinion of a treating physician is not binding if it is contradicted by substantial evidence, and the report of a consultative physician may constitute substantial evidence." *Id.* at *17 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983)).  In summary, the ALJ did not err in his handling of the opinion evidence in this case.

**B.    The Plaintiff's Challenges to the ALJ's Evaluation of Her Subjective Statements About the Intensity, Persistence and Limiting Effects of Her Symptoms.**

The Plaintiff next argues that the ALJ did not properly evaluate her subjective statements about the intensity, persistence and limiting effects of her symptoms.  (ECF No. 20, at 8-11.)  She asserts that his 'brief evaluation" was "insufficient and a gross mischaracterization of the record" (*id.* at 9); his analysis was flawed "focusing on allegedly normal clinical and objective evidence from the period at issue" (*id.*); he failed in his duty to articulate the reasons for crediting or not crediting a claimant's subjective statements by applying the regulatory factors (*id.* at 9-10 (citing 20 C.F.R. §§ 404.1529, 419.929; SSR 16-3p)); and he generally erred in his assessment of her credibility.  (*Id.* at 8-11.)

The Plaintiff's argument implicates the SSA's two-step process for evaluating a claimant's symptoms.  *See* 20 C.F.R. § 404.1529(c)(1); *see also* Soc. Sec. Ruling ("SSR") 16-3P, 2017 WL 5180304, at *3 (S.S.A. Oct. 25, 2017) ("We use a two-step process for evaluating an individual's symptoms.").  In the first step of the process, the ALJ must determine whether the "medical signs or laboratory findings" show that the claimant "has a medically determinable impairment . . . that could reasonably be expected to produce" her symptoms.  *Id.*  If so, the ALJ must then proceed to the second step, at which he evaluates "the intensity and persistence of [the claimant's] symptoms

such as pain," and determines the extent to which those symptoms "limit his or her ability to perform work-related activities." *Id.* at *4; *see also Genier*, 606 F.3d at 49. In this case, the ALJ found "that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms." (R. 542.) He added, however, that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not fully supported from May 17, 2010 to May 10, 2016." (*Id.*) Since the ALJ agreed with her at the first step, the Plaintiff's argument is necessarily a challenge to the way he handled the second step.

At that step, "the ALJ must consider all of the available evidence, including objective medical evidence, from both medical and nonmedical sources." *Gonzalez v. Berryhill*, No. 3:18-cv-00241 (SRU), 2020 WL 1452610, at *12 (D. Conn. Mar. 25, 2020). The ALJ "may not reject a claimant's subjective opinion regarding the intensity and persistence" of her symptoms "'solely because the available objective medical evidence does not substantiate . . . her statements." *Id.* (quoting 20 C.F.R. § 416.929(c)(2)) (alteration omitted); *see also* 20 C.F.R. § 404.1529(c)(2). If there is a conflict between the objective evidence and the claimant's testimony, "the ALJ 'must consider the other evidence and make a finding on the credibility of the individual's statements,'" and "should consider . . . (1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the claimant's pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain; (5) treatment, other than medication, received for pain relief; (6) measures taken to relieve pain and other symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms." *Id.* (quoting *Graf v. Berryhill*, No. 3:18-cv-00093 (SRU), 2019 WL 1237105, at *8 (D. Conn. Mar. 18, 2019)) (internal quotation marks and alterations omitted).

Provided that the ALJ follows this process, his conclusions are entitled to deference from this Court.  "It is the role of the Commissioner, not the reviewing court, 'to resolve evidentiary conflicts and to appraise the credibility of witnesses,' including with respect to the severity of a claimant's symptoms."  *Cichocki v. Astrue*, 534 F. App'x 71, 75 (2d Cir. 2013) (summary order) (quoting *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983)).  "Credibility findings of an ALJ are entitled to great deference and therefore can be reversed only if they are 'patently unreasonable.'"  *Pietrunti v. Dir., Office of Workers' Comp. Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997) (quoting *Lennon v. Waterfront Transp.*, 20 F.3d 658, 661 (5th Cir. 1994)); *see also Gonzalez*, 2020 WL 1452610, at *13 (same).

In this case, the ALJ followed the process set out in the regulations.  He began by considering the objective medical evidence, and he noted both the absence of any treatment notes supporting her claims of dizziness, and the many treatment notes that undercut her claims of recurrent headaches.  (R. 543) (citing R. 303, 319, 452, 469 (dizziness) and R. 1334, 1516, 1541, 1555, 1728, 1814 (headache)).  Yet he did not stop there; rather, he considered the other applicable 20 C.F.R. § 416.929(c)(3) factors as well.  For example, he considered "activities of daily living" when he observed that the Plaintiff "could perform some cooking, cleaning, and grocery shopping," noting that she had testified that she could do so "only if it was required and she fatigues easily."  (R. 542.)  He made a number of notations about the "location, duration, frequency and intensity" of the Plaintiff's symptoms.  (*E.g.,* R. 540-41, 542-43.)  He also considered the effects of medication on her symptoms, and the measures she had taken to relieve her symptoms, when he noted that she "ha[d] a history of uncontrolled and poorly controlled diabetes mellitus generally due to noncompliance with medication and treatment, resulting in hospitalizations for diabetic ketoacidosis . . . due to running out of insulin."  (R. 542.)

"Because the ALJ followed the process set out in the regulations, to prevail in her argument the Plaintiff must show that the ALJ's substantive decision was 'patently unreasonable.'" *Jennifer Lynn E. v. Kijakazi*, No. 20-cv-695 (TOF), 2021 WL 4472702, at *10 (D. Conn. Sept. 30, 2021) (citing *Pietrunti*, 119 F.3d at 1042)). Here, the Plaintiff has not shown that the ALJ's treatment of her subjective statements was unreasonable. She testified that she had "[a] lotta problems" with activities of daily living because of "pain and . . . fatigue," but she told medical providers on at least two occasions that she was fully independent in that regard. (*See* R. 1333 (medical report from Dr. Urciuoli, stating that Plaintiff was "self-reliant in usual daily activities," "able to do [her] own laundry," and had "no difficulty walking unassisted"); R. 1560 (report of Dr. J. Lugo, stating: "She does cook and clean. She does her chores. She takes care of her ADLs.").) When asked at the 2016 hearing what prevented her "from doing even a desk-type job," she testified that the "[m]ain thing is I feel lethargic most of the time" (R. 649), but Dr. Kaplan testified that since "she was not anemic," "there would be no reason for her to . . . feel particularly tired and fatigued, except for [her] weight." (R. 621.) In light of these and other items of evidence in the record, the ALJ acted reasonably when he concluded that "the claimant's statements concerning the intensity, persistence and limiting effects of [her] symptoms are not fully supported from May 17, 2010 to May 10, 2016." (R. 542.)

The substantial evidence rule "means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154, 203 L. Ed. 2d 504 (2019) (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)). The decision by the ALJ to discount the plaintiff's subjective complaints is supported by substantial evidence in the record. The ALJ properly weighed the conflicting evidence in the record, *Clark v. Comm'r of Soc. Sec.*, 143 F.3d

115, 118 (2d Cir. 1998) ("[I]t is up to the agency, and not this court, to weigh the conflicting evidence in the record."), and because he followed the process set out in the regulations, it was within his discretion to discredit the unsupported elements of the Plaintiff's subjective complaints. I conclude that the ALJ did not err in considering the Plaintiff's subjective statements and based his decision on substantial evidence.

## IV.    CONCLUSION

For the reasons stated above, I recommend (1) that the Plaintiff's Motion for Order reversing or remanding the Commissioner's decision (ECF No. 19) be denied; (2) that the Defendant's Motion for an Order Affirming the Decision of the Commissioner (ECF No. 25) be granted; and (3) that judgement enter in the Commissioner's favor.

This is a recommended ruling by a magistrate judge. *See* Fed. R. Civ. P. 72(b)(1).  Any objections to this recommended ruling must be filed with the Clerk of the Court within fourteen (14) days of being served with this order.  *See* Fed. R. Civ. P. 72(b)(2).  Failure to object within fourteen (14) days will preclude appellate review.  *See* 28 U.S.C. § 636(b)(1); Rules 72, 6(a) and 6(e) of the Federal Rules of Civil Procedure; D. Conn. L. Civ. R. 72.2; *Impala v. United States Dep't of Justice*, 670 F. App'x 32 (2d Cir. 2016) (summary order) (failure to file timely objection to Magistrate Judge's recommended ruling will preclude further appeal to Second Circuit); *Small v. Secretary of H.H.S.*, 892 F.2d 15 (2d Cir. 1989)(per curiam).


                                                    */s/ Thomas O. Farrish*
                                        ————————————————————
                                             Hon. Thomas O. Farrish
                                             United States Magistrate Judge